**In re Thomas CARNEY, Magisterial District Judge, Magisterial District 06–1–03 Erie County.**

Court of Judicial Discipline of Pennsylvania.

May 26, 2011.
Order Dismissing Complaint
June 8, 2011.

---

Before JUDGE, SR., P.J, KURTZ, P.J.E., JAMES, MORRIS, CURRAN, McGINLEY, CLEMENT, JR., JJ.

Joseph A. Massa, Jr., Counsel, Judicial Conduct Board, for the Judicial Conduct Board.

David G. Ridge, Erie, PA, for Respondent.

OPINION BY Judge CURRAN.

## I. *INTRODUCTORY SUMMARY*

The Judicial Conduct Board ("the Board") has filed a Complaint with this Court against Magisterial District Judge Thomas Carney ("Respondent"). The Complaint consists of seven Counts (actually six Counts because Count 1 and Count 7 are the same).[1] The conduct of Respondent which the Board has charged as violating various standards of judicial conduct includes:

— making public comments about cases pending or impending in his office or in any court (see Rule 6 of the Rules Governing Standards of Conduct of Magisterial District Judges and Count 3),

— failing to disqualify himself in proceedings in which his impartiality might reasonably be questioned (see Rule

---

1. Counts 1 and 7 charge that Respondent "violated Article V, § 18(d)(1) of the Pennsylvania Constitution by engaging in activity which brings the judicial office into disrepute." The Complaint describes various, and different, types of conduct. Inasmuch as it is not specified in the Complaint which conduct of Respondent it is which the Board considers as "bring[ing] the judicial office into disrepute," we will address that charge as applying to *all* of Respondent's conduct averred in the Complaint. There is no alternative.

8A(1) of the Rules Governing Standards of Conduct of Magisterial District Judges and Count 4),

— soliciting funds for the Anti–Graffiti Task Force (see Rule 11 of the Rules Governing Standards of Conduct of Magisterial District Judges and Count 6),

— displaying a handgun out the window of his car to the two occupants of another vehicle while traveling on Interstate Highway I–79 (see Rule 2A of the Rules Governing Standards of Conduct of Magisterial District Judges and Count 2),[2]

— allowing a relationship to influence his judicial conduct or judgment and by lending the prestige of his office to advance the private interest of others (see Rule 2A of the Rules Governing Standards of Conduct of Magisterial District Judges and Count 5).[3]

The Board and the Respondent have submitted stipulations as to some of the facts in this case pursuant to C.J.D.R.P. No. 502(D)(2). The Court accepted the pertinent stipulations and proceeded to trial.

As we make our findings of fact, we will discuss the efficacy of those facts in establishing the violations of the Constitution and of the Rules Governing Standards of Conduct of Magisterial District Judges asserted by the Board and set out in the Complaint,

## II. *FINDINGS OF FACT AND DISCUSSION*

A. *Introductory*

1. This action is taken pursuant to the authority of the Board under Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania by which the Board is granted authority to determine whether there is probable cause to file formal charges, and, when it concludes that probable cause exists, to file formal charges, against a justice, judge or magisterial district judge, for proscribed conduct and to present the ease in support of such charges before the Court of Judicial Discipline.

2. Since on or about January 2, 2006, and at all times relevant hereto, the Respondent has served continuously to the present as Magisterial District Judge of

---

**2.** It is only by employing a measure of extrapolation that we come to the conclusion that the Board's charge that it is Respondent's conduct with the handgun that the Board considers a violation of Rule 2A because in Count 2, which asserts a violation of 2A, the Board quotes the language of Rule 2A which requires a magisterial district judge to "comply with the law" and the only conduct set out in the Complaint which might be viewed as not complying with the law is the episode with the handgun. There is an additional issue which we must address in considering whether the handgun incident can be a violation of Rule 2A. This issue arises because of dictum which appears in the Pennsylvania Supreme Court's Order, (587 Pa. 407, 899 A.2d 1120 (2006)), affirming this Court's Order in *In re Harrington*, 877 A.2d 570 (Pa.Ct. Jud.Disc.2005). In that Order the Supreme Court noted its "disapprov[al]" of this Court's

conclusion that Harrington's conduct was a violation of Rule 2A "because that conduct did not implicate the decision-making process"—even though Harrington's conduct did not comply with the law.

**3.** We guess, and will assume, that Count 5 is referring to Respondent's connection with the Anti–Graffiti Task Force; but we are unable to find any allegations in the Complaint (or any evidence in this record) which matches the conduct proscribed by the language of Rule 2A quoted in Count 5. Furthermore, the same issue arising from the Supreme Court's Order in the *Harrington* case, which seems to make "the decision-making process" a *sine qua non* of any violation of Rule 2 A, arises here again, and must be addressed in any consideration of the violation of Rule 2A alleged in Count 5. See, n. 2, *supra.*

Magisterial District 06–1–03, Erie County, Pennsylvania, encompassing the City of Erie–Ward 3, with an office located at 718 West 18th Street, Erie, Pennsylvania 16502. As a Magisterial District Judge, he is, and at all times relevant hereto, subject to all the duties and responsibilities imposed on him by the Rules Governing Standards of Conduct of Magisterial District Judges and the Constitution of Pennsylvania.

## B. *Public Statements About Pending and Impending Cases*

### Findings of Fact

3. On or about November 25, 2007, Tyra Butler, age 38 and her 16 year old son were charged by police with Criminal Conspiracy to Commit Robbery and Possessing Instruments of a Crime. Butler was charged additionally with Corrupting the Morals of a Minor.

4. Butler was arraigned before the Respondent, who set bail at $50,000 each. Butler was unable to post bail and was remanded to the Erie County Prison. Butler's son was remanded to the Edmund L. Thomas Adolescent Center.

5. The episode (armed robbery) and the arraignment were reported in an article appearing in the *Erie Times–News* on November 26, 2007. The article ended with a report of the $50,000 bail set by Respondent immediately followed by Respondent's statement:

> "There have been a lot of robberies lately and we want to send a message that this will not be tolerated." (Board Exhibit 1.)

### Discussion

█ Rule 6 provides;

Magisterial district judges shall abstain from public comment about a proceeding pending or impending in their offices or in any court, and shall require similar abstention on the part of their staff. This rule does not prohibit magisterial district judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.

While the Respondent does not deny that the short statement attributed to him in Finding of Fact No. 5 is an accurate quotation, it is obvious that the quotation is a short excerpt from an interview conducted by a reporter. This is obvious because experience and common sense tell us that Respondent did not make this statement to an empty room. The statement obviously was made in reference to a specific subject—in this case the amount of bail. Based on the allegations in the Complaint which are contained in Findings of Fact Nos. 3 and 4, as well as the full text of the article (Board Exhibit 1), we have no doubt that the question Respondent was addressing had to do with the $50,000 bail Respondent had set for the juvenile. Respondent's statement is his explanation for setting bail as high as $50,000 for a juvenile. We think he is entitled to make such an explanation. We think, and we hold, that Rule 6 explicitly permits him to do that. The controlling language of Rule 6 provides:

> This rule does not prohibit magisterial district judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.

It is our view that this provision clearly covers Respondent's public explanation of his procedure for setting high bail in this case.

We have been discriminating in citing the courts of other states as authority in matters of judicial discipline; but here we call attention to the case of *Office of Disci-*

*plinary Counsel v. Souers,* 66 Ohio St.3d 199, 611 N.E.2d 305 (1993), where the Supreme Court of Ohio dealt with the *exact same charge* arising out of the *exact same conduct* as in this case. In a *Per Curiam* opinion that court said:

> We reject the board's conclusions of law and recommendation for two reasons. First, Canon 3(A)(6) permits public judicial comment to explain court procedure. [The court then sets out in a footnote the language of its Canon 3(A)(6), which is essentially identical to Rule 6, placing emphasis on the words: *"This subsection does not prohibit judges ... from explaining for public information the procedures of the court."*] Respondent's defense of his sentencing order ... was provided to publicly explain his procedure in the underlying criminal case. Thus, we cannot discipline respondent for conduct the canon expressly authorizes.

*Id.* at 200, 611 N.E.2d at 306.

This is exactly the holding we make here and exactly the reason for it. For that reason and because the language with which the Ohio court was dealing is identical to the language of Rule 6, with which we are dealing, we think it is entirely appropriate to cite the case, as it stands solidly in support of our conclusion here.

We conclude that the Board has not established by clear and convincing evidence that Respondent's statement set out in Finding of Fact No. 5 constituted a violation of Rule 6.

We also hold that Respondent's making the public statement here discussed was not conduct such that brings the judicial office into disrepute and thus was not a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

**4.** It is not established when these interviews were conducted or whether they were con-

### Findings of Fact

6. On April 25, 2008, in a 6:00 P.M. newscast, WICU–TV in Erie, Pennsylvania, aired an interview of a victim of a recent attack. The interview with the victim was conducted on the street where the attack had taken place.

7. In the course of the newscast portions of interviews with Respondent were shown. These interviews were conducted in Respondent's office entirely separate from the interview of the victim.[4] Personnel at WICU–TV then put together portions of the interviews of Respondent with the interview of the victim. Personnel at WICU–TV selected what portions of Respondent's interviews to include in the broadcast and determined where to insert them.

8. The portions of the interview of the victim aired on April 25, 2008 included the following:

> **REPORTER:** Steve Lehner was brutally attacked at random by a 15 and 16 year old kid as he was walking home carrying a bag of groceries. He says they hit him on the back of his head with a brick and stabbed him.
>
> **LEHNER:** Kids just approached me from across the street and they followed me up to Cochran Street ... and they just jumped me and ... they stabbed three times. It was a random thing, if it hadn't been me, it would have been somebody else.
>
> **REPORTER:** Lehner spent about a week in the hospital recovering. 15 year old Jacob Sterling and 16 year old Adam Brown are facing adult charges of aggravated assault for the attack. District Judge Tom Carney arraigned them.

ducted in one "sitting" or on multiple occasions.

REPORTER: Lehner says he hopes the kids that attacked him, get that message that the law is sending.

LEHNER: Mad, I'd be real mad, anger. But I also want to say that I can forgive them for what they did. But, ah . . . I'm going to have justice. If you're going to do something like that, ya know, if you're adult enough to do it, you're adult enough, ya know, to be charged like an adult.

REPORTER: Kids, charged with serious crimes and walking into courtrooms to pay for them. Something that Judge Carney says he's seeing a lot of, but hopefully, not for long.

REPORTER: (To victim) So they didn't say give me your money?

VICTIM: No, no.

REPORTER: On February 8th, a Millcreek family is approached by a group of teenagers while walking to the car after a basketball game. The teens allegedly attacked the father, he wound up in the hospital. Erie Police ended up charging the kids with assault. A week later, on February 14th, an East teacher was beaten with a belt. It happened right after school. Three students were charged with felony assault for that crime. Then on March 24th, three 18 year olds allegedly broke into a home on Ross Street and beat an elderly man with a mop handle. Police say they also robbed him. All three are facing several charges, including robbery and assault. The 84 year old victim of that home invasion, died last week of a stroke.

REPORTER: On March 30th, a man was randomly attacked while carrying a bag of groceries home. A 15 and a 16 year old were both charged as an adult for the attack. They allegedly hit the victim with a brick and stabbed him several times.

REPORTER: Meanwhile, District Judge Tom Carney says he is seeing more and more kids walk into his courtroom charged with violent crimes like these.

9. The portions of the interviews of Respondent aired in the same newscast on April 25, 2008 included the following:

CARNEY: The last one I just had, where the kids beat that guy in the back of the head with a brick and stabbed him in the back and lacerated his liver . . . $50,000 cash. They went to the Erie County Prison, 16 and 17 years old . . . not to M & L (unclear). They have to realize they have to pay for their crime and society is going to start to take a more of a swift and hard approach to this.

If these kids don't start getting the message, they're going to find out the hard way. They better start listening and learning because we're going to be coming down on them.

Today, it's a regular part of the job . . . that I have to tell these young kids, 15 years of age or older, 16 and 17, that you have done a violent crime, you're being treated as an adult under the Fisher Bill, you're being charged as an adult. They gotta realize that if they're going to do serious crime, they're going to be charged as an adult, and they're going to be . . . uhm . . . prosecuted as an adult. These guys, they committed serious crimes and society is looking at the crime, not the age. 35% of those kids come from single-parent families. What's happening in this society, our parents raised us. These kids today, they're getting raised at school, or they're getting street wise.[5]

---

5. These three paragraphs of Respondent's remarks are set forth here in the sequence they

## Discussion

■ The Board contends that Respondent's statements to a WICU–TV reporter set out in Finding of Fact No. 9, later televised on April 25, 2008, also constitute a violation of Rule 6.

In addressing this question it is important to keep in mind that the three paragraphs set out in Finding of Fact No. 9 were parts of a larger interview of Respondent, or of a number of interviews. Thus, any consideration of a Rule 6 violation here must include a recognition that much (if not most) of what Respondent had to say to the reporter is not included in the selected quotations. It landed on the "cutting room floor" and went out with the rest of the trash at the station. It must also be recognized that the selection of just *what* to excerpt and *where* to place the excerpts are decisions made by personnel at WICU to serve their journalistic sensibilities. Each of the three paragraphs quoted in Finding of Fact No. 9 and included in the telecast were inserted separate, each from the other, and at different places in the broadcast. In other words, WICU inserted Respondent's words where it thought they would best help convey the message WICU wanted to convey. In addition, the placement of Respondent's remarks in the script is such that it appears that Respondent is intending to respond to what immediately precedes his statements. That is not the case. We will, then, consider the totality of what Respondent was saying without consideration of how it was split up or where it was placed in the script for the broadcast—decisions with which Respondent had nothing to do, and over which, certainly, he had no control.

were shown in the telecast. That is not to say, however, and the Board has not established (certainly not by clear and convincing evidence), that this is the sequence in which

It is immediately apparent that Respondent's statements set out in Finding of Fact No. 9 which were aired on WICU–TV do not run afoul of Rule 6 for the same reason that the statements in the newspaper article set out in Finding of Fact No. 5 and discussed above do not violate Rule 6. As a matter of fact, a portion of the televised statements have to do with the same case and repeat Respondent's explanation of the imposition of high bail for the same juvenile. A review of Respondent's televised remarks makes it clear to us that the purpose of the remarks was to explain to the public that courts (including his) are required, under the "Fisher Bill" to treat juveniles who commit serious crimes as adults. This is consistent with Respondent's testimony. He testified:

Q. [Mr. Ridge] Starting off, Your Honor, [addressing the witness] with the bond in the case where you purchased a high bond, a $50,000 bond. And again, we're not going to review every word—the video and the voice speak for themselves. What was the point, if you will, of giving a statement to the press—to the public through the press about why you set the bond at that level?

A. Well, there was a young individual in one of the first questions the reporter asked me—you see all of those illustrations of videos that's—what's on the cutting room floor. They're showing you what's advantageous to them obviously, but when I'm asked about the juvenile crime and the increase of—and I'm going to start this way.

They asked me under Act 33 of the Fisher Bill, how much activity changes through my judicial period on the bench I've witnessed. Well, the individuals

Respondent made the remarks in his interview(s). This Finding of Fact, therefore, is made with that proviso.

that are 15 years of age or older who do a serious crime are being charged under the Fisher Bill.

My first year on the bench I had one. My second year on the bench I had three. My third year on the bench I had eight or nine, and I think I had 12 last year. I was just trying to emphasize the point generically without mentioning anyone's names, any docket number, any case load, that these kids are not going to go through the FNL Thomas Detention Center.

They're going to be sitting in the Erie County prison just like adults. And they need to really understand that. They have this mentality, hey, I can do this and I'm just going to go up to the FNL. I thought I was doing—promoting judiciary and expressing the severity of the crimes that were occurring and just trying to let them know what possible ramifications could occur. (N.T. 62–63).

Q. And again, so what's the point of giving statements to the media? Did you ever call the newspaper reporter saying you want to give a statement?

A. No. They seek me out. And unless you read the Pennsylvania Bulletin, people don't even know today that you got to put your headlights on when it's raining. I mean, there's not a whole lot of awareness and education out there when it comes to certain issues. And I just thought I was doing a diligent thing by bringing some of these things to peoples' attention, being very careful, mind you, not to violate anyone's constitutional rights, anyone's rights to a fair trial or proceeding, not mentioning a name, a docket number, case load or even the judge it may be going in front of. It's just a generic statement. (N.T. 65–66).

We believe it is easily seen that what Respondent was saying to the public in the WICU–TV telecast of April 25, 2008 he was expressly permitted to say by Rule 6 of the Rules Governing Standards of Conduct of Magisterial District Judges. We hold, therefore, that the Board has not established a violation of Rule 6 by clear and convincing evidence.

We hold that Respondent's making the public statements here discussed was not conduct such that brings the judicial office into disrepute and thus was not a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

C. *Failing to Disqualify Himself in Proceedings in Which His Impartiality Might Reasonably Be Questioned*

***Findings of Fact***

10. Prior to January 5, 2008, Erie Mayor Joseph E. Sinnott announced the formation of an Anti–Graffiti Task Force, under the direction of the Respondent, with the goals of:

1. identifying, tracking and removal of graffiti;

2. creation of brochures and public service announcements;

3. to identify and prosecute "taggers" to the fullest extent of the law and to pursue full restitution for their crimes; and

4. to assist the City of Erie and local businesses in removing graffiti from their property.

11. In an article in the *Erie Times–News* on January 5, 2008, Respondent was quoted as saying: "It's (graffiti) a real problem that's growing worse by the day, especially in the inner city." He was further quoted as saying, "Dennis Braendel offered to donate funds to come up with a solution, and many others have volunteered their time, so we're putting together a group to address the problem."

12. In an article in the *Erie Times–News* on March 21, 2008, it was reported that Respondent said that the Task Force would seek community help in identifying the vandals and would suggest tougher fines for violations. He was further quoted as saying: "We think graffiti's ugly. It's criminal in nature, and we're going to work our hardest to abate it."

13. On June 25, 2008, Respondent appeared on the early morning newscast of WJET–TV in Erie, Pennsylvania. Respondent and the Reporter engaged in a dialogue as follows:

**REPORTER:** The Graffiti Task Force is brainstorming new ways to clean up our local neighborhoods . . .

The task force met yesterday to come up with ideas on how to stop the unwanted art that is being spread throughout the community. Before each block party they will be cleaning up the graffiti on street signs and mailboxes to make downtown as appealing as possible.

They are also trying to get a grant so they are able to buy cameras to put up in the trees and polls [sic] to catch any vandals in action.

**CARNEY:** This isn't just de minimus crime that's fines and costs could be substantial and that when they tag banks, schools, and a synagogue like some just recently tagged a synagogue at 10th & Liberty, that's institutional vandalism. That's a serious crime.

**REPORTER:** This Community service project is ongoing at no cost to the taxpayers.

---

**6.** These Findings of Fact correspond verbatim with the Board's allegations in paragraphs 7–10 of the Complaint, which are admitted by Respondent. See Respondent's Answer to the Board's Complaint, paragraphs 7–10.

**7.** This is not to suggest that, if such a case came before Respondent, he would necessarily be required to disqualify himself or face

### Discussion

 The Board asserts that the facts contained in Findings of Fact Nos. 10–13 [6] support the charge made in Count 4 of the Complaint and constitute a violation of Rule 8A(1). That Rule provides:

A. Magisterial district judges shall disqualify themselves in a proceeding in which their impartiality might reasonably be questioned, including but not limited to instances where:

(1) they have a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

There is no evidence in this record—nor even any allegation in the Complaint (see Complaint, paragraphs 7–10)—that there ever was a proceeding that came before Respondent where the Anti–Graffiti Task Force was a party, or where a member of the Anti–Graffiti Task Force was a party, or where someone was charged with spray painting graffiti on public or private property,[7] or where graffiti was even involved. We are at a loss to fathom how the Board can expect that a judge should/could disqualify himself from a non-existent proceeding.

We will not belabor the point. We hold that the Board has established no violation of Rule 8A(1) of the Rules Governing Standards of Conduct of Magisterial District Judges.

Obviously, conduct which did not occur cannot be such that brings the judicial office into disrepute.

---

discipline for violation of Rule 8A(1). We dare say all judges are against graffiti—as all judges are against rape and all are against crime—that they say so publicly, does not mean that all who say so are *ipso facto* unqualified to hear cases involving those crimes or any crimes.

### D. *Soliciting Funds for a Civic Organization*

#### Findings of Fact

14. In an editorial in the *Erie Times–News* on July 23, 2008, entitled "Graffiti fighters lead way," Respondent was identified as a leader of the Anti–Graffiti Task Force. One of the ideas for the Task Force which Respondent had described to the *Erie Times–News* was setting up a reward fund. Respondent was quoted as saying: "for any good Samaritan (who can) help us and assist us" in catching vandals in the act or after the act. The editorial stated that "a local businessman has donated $2,000 to start the reward fund. Call Carney's office at 451–6528 if you can make a contribution." [8]

■ First, we point out that the Board's case for a violation of Rule 11 is based entirely on an *editorial*.[9] Second, we believe that our consideration of whether anything in that editorial establishes a violation of Rule 11 by Respondent must include consideration of the entire editorial. The full text of that editorial is as follows:

#### GRAFFITI FIGHTERS LEAD WAY

Get lost, graffiti vandals. We hope those smearing Erie properties with spray paint will get that message after last week's very public scrubbing of an Interstate 79 sign.

Tom Carney, district judge for Erie's 3rd Ward, says that cleaning up the back of that sign—the one that shows drivers how to exit from the interstate onto West 12 Street—represents another milestone for Erie's anti-graffiti task force.

The Pennsylvania Department of Transportation provided the equipment, and volunteers from Braendel Painting and Service did the work.

"The graffiti task force is working hard in building relationships and coalitions with different agencies," Carney said. Those tackling graffiti include CSX, the Erie Metropolitan Transit Authority, the U.S. Postal Service and now PennDOT, as well as volunteers from local colleges, nonprofits and the city of Erie. Braendel, Sherwin–Williams and Home Depot are some of the businesses that have joined the effort.

Sickened by the spread of graffiti and worried about how the spray-painted tags mar Erie's landscape, Carney spurred local officials to create the anti-graffiti task force.

Painting graffiti high atop a PennDOT traffic sign is apparently a mark of pride for the vandals, but getting PennDOT involved in removing it is a bigger coup for the anti-graffiti task force.

"They're being persistent. We're being determined," Carney said, comparing the vandals to the task-force volunteers.

Carney is right to target graffiti as a top priority in Erie. Even better, he has a vision to strengthen local anti-graffiti efforts. His ideas include:

● Setting up a reward fund for "any good Samaritan (who can) help us and assist us" in catching vandals in the act or after the fact. A local businessman has donated $2,000 to start the reward fund. Call Carney's office at

---

**8.** This latter quotation is what the editorial said—not anything the Respondent said.

**9.** Editorials are written for the purpose of expressing the view of the editorial board on an issue it perceives to have some current interest. Any "facts" included in the editorial are selected on the basis of how well they are seen by the board to support its view on the subject of the editorial. For news articles, on the other hand, primacy is supposed to be given to the fairness and accuracy of the reporting.

451–6528 if you can make a contribution.

- Creating a hotline and a Web site where you can lodge complaints about graffiti.
- Following the lead of Allentown, where it is illegal to sell spray paint and markers to minors and it is also illegal for anyone to possess spray paint or markers in a public park.

Allentown also has an aggressive policy to remove graffiti within 48 hours of its reporting.

- Expanding the reach of the anti-graffiti effort beyond Erie into neighboring suburbs.

Carney doesn't want the vandals to find new targets once their damage is eradicated in Erie. Graffiti can be targeted as a regional problem, he said.

Carney, of course, isn't alone in being outraged by the graffiti epidemic in Erie. Consider Rebecca Lynn Collins' letter to the editor. "I want to move back to New York.... My front door has graffiti on it," Collins said, referring to her concerns about crime and vandalism.

Graffiti vandals should get lost, not regular citizens.

Clean up PennDOT's West 12th Street sign was another step in the right direction.

The first thing one notices is that the only words of Respondent which the editorial writer purported to quote are

"any good Samaritan (who can)[10] help us and assist us"

These words obviously do not establish that Respondent solicited funds. And they are obviously not in context, so the editorial writer attempted to supply it: he says Carney has an "idea." He says Carney has an "idea" of "setting up a reward fund"[11] for the good Samaritans. It hardly needs saying that having an "idea" of setting up a reward fund and soliciting funds are not the same thing. Having ideas does not constitute a violation of Rule 11—we daresay the drafters did not have that in mind. We hold, therefore, that the quotation about the good Samaritan does not amount to a violation of Rule 11.

The Board has another contention, however. In paragraph 11 of its Complaint the Board asserts that:

Respondent stated that a local businessman had donated $2,000 to start the reward fund. People were asked to call Respondent's office at 451–6528 if they could make contributions. (Board Complaint para. 11).

That is mischaracterization of what the editorial says. The editorial does not say that the Respondent said that. It does not say Respondent said anything about a local businessman, or anything about a donation, or anything about "call[ing] Carney's office." It is obvious from reading the editorial that the editorial writer and the editorial staff of the *Erie Times–News* knew how and when to designate a quotation: they used quotation marks. The presence of quotation marks is evidence that Respondent said "any good Samaritan (who can) help us and assist us"; the absence of quotation marks (especially in the same paragraph where quotation marks *are* used) is evidence that Respondent did not say anything about a local

---

10. We do not know what the parenthesis is supposed to mean. Does it mean Respondent did not say "who can"? The editorial writer's purpose here is really not knowable, and a reader is left uncertain as to what it was Respondent actually said.

11. Quoting the editorial writer—not the Respondent.

businessman donating $2,000 or that people should call Carney's office to make contributions. The Board's allegation that he did is unjustified and is not supported by the evidence. Moreover, Respondent denied ever asking for donations or soliciting funds in any fashion (See N.T. 70, 71, 73) and we believe him.[12]

We, therefore, hold that the Board has not established that Respondent violated Rule 11 of the Rules Governing Standards of Conduct of Magisterial District Judges, and certainly not by clear and convincing evidence.

Since we find that Respondent did not solicit funds for the Anti–Graffiti Task Force, the charge that the conduct here discussed was such that brings the judicial office into disrepute has not been established.

E. *Displaying a Handgun Out the Window of His Car to Two Occupants of Another Vehicle While Traveling on Interstate Highway I–79*

### Findings of Fact

15. On January 11, 2009, after having attended a Pittsburgh Steelers football game at Heinz Field, Pittsburgh, Respondent was driving northbound on Interstate 79, en route to Erie.

16. Approximately 4–5 miles north of Exit 105 (Slippery Rock exit), Respondent drove up behind a vehicle driven by Nico Baldelli, a freshman at Mercyhurst College–North East, in the left-hand lane, wanting to pass. Respondent flashed his high beams but Baldelli continued to drive in the left-hand lane. Ryan J. Tanner, Baldelli's roommate at Mercyhurst was a passenger in the right front seat of Baldelli's vehicle at the time.

17. Respondent then moved into the right-hand lane and passed Baldelli. While passing Baldelli, Respondent displayed his middle finger to Baldelli and Tanner. In other words Respondent "gave him the finger."

18. After Respondent passed him, Baldelli moved into the right-hand lane behind Respondent and flicked his high beams at Respondent's vehicle. Respondent then let his speed come back down to where it had been on cruise control and Baldelli returned to the left-hand lane and came up alongside Respondent. At that point Baldelli turned on his inside light and gave Respondent the finger all the while yelling obscenities at Respondent.

19. Respondent then increased speed somewhat until he, in the driver's seat, was approximately alongside the front bumper of Baldelli's vehicle, at which time Respondent rolled his window half way down and took a silver handgun which he kept in the console beside the driver's seat and held it with his thumb and index finger out the window briefly (for two or three seconds) so that Baldelli could see it. The gun was never pointed at the Baldelli vehicle or either of its occupants. Baldelli then "backed off" and continued northward towards Erie at a slower speed. Respondent was concerned about the escalation of the incident and displayed the gun in an effort to defuse the situation with the intention (or hope) that showing Baldelli the gun would result in Baldelli "backing off," which it did.

20. Baldelli called his parents; the State Police were notified and eventually

---

12. The Task Force didn't even have a bank account.

 Judge Curran. Does the Task Force raise money?

 A. No, we don't even have a treasury.

 Judge Curran. You have no back account?

 A. No. No account. No money given. No money taken. (N.T. 70–71).

stopped Respondent some 75–80 miles north of the location on 1–79 where the above described incident had taken place.

21. On June 15, 2009 the State Police filed charges against Respondent accusing him of:

1. Terroristic Threats (18 Pa.S.C.A. § 2706—Misdemeanor 1st Degree);

2. Simple Assault (18 Pa.C.S.A. § 2701(A)(3)—Misdemeanor 3rd Degree);

3. Disorderly Conduct (18 Pa.C.S.A. § 5503(A)(4)—Misdemeanor 3rd Degree); and

4. Recklessly Endangering Another Person (18 Pa.C.S.A. § 2705—Misdemeanor 2nd Degree).

22. On August 6, 2009, Magisterial District Judge Lorinda L. Hinch, of Magisterial District 35–3–01, Mercer County, presided at Respondent's preliminary hearing. Following testimony, Judge Hinch dismissed all charges against Respondent.

23. Subsequently, the Pennsylvania State Police re-filed charges accusing Respondent of two (2) misdemeanor counts each of: Terroristic Threats, Simple Assault, Recklessly Endangering Another Person and Disorderly Conduct.

24. On November 10, 2009, Respondent pled guilty to two (2) summary offenses of Disorderly Conduct and was ordered to pay fines and costs totaling $541.00. In exchange for the plea, the Mercer County District Attorney's Office dropped all other charges against Respondent.

25. Respondent had a concealed weapon permit to carry a Walther PPK 389 mm caliber handgun. Respondent obtained the gun and the permit because not infre-

quently his office would receive as much as $10,000–$25,000 cash bail which he would be required to take to the bank through a neighborhood of "drug dealers, prostitutes and crazy bars." [13]

### Discussion

■ (1) The Board has charged that the conduct described in Findings of Fact Nos. 15–25 is such that brings the judicial office into disrepute in violation of Article V, § 18(d)(1) of the Pennsylvania Constitution.

This Court has been called upon frequently to decide whether particular conduct is such that—in the words of our Constitution—"brings the judicial office into disrepute." [14]

In evaluating the conduct in each and every one of these cases the Court has consistently applied certain principles and tests in our determinations that any particular conduct was—or was not—such that brings the judicial office into disrepute. In all cases where those holdings have been reviewed by our Supreme Court, those holdings have been affirmed. *See, In re Berkhimer*, 593 Pa. 366, 930 A.2d 1255 (2007); *In re Harrington*, 587 Pa. 407, 899 A.2d 1120 (2006); *In re McCarthy*, 576 Pa. 224, 839 A.2d 182 (2003); *In re Cicchetti*, 560 Pa. 183, 743 A.2d 431 (2000).

These principles for assessing the conduct as bringing the judicial office into disrepute were first set down in this Court's opinion in *In re Smith*, 687 A.2d 1229 (Pa.Ct.Jud.Disc.1996). There we said:

> It cannot be *presumed* that a violation of any other provision, constitutional, can-

---

13. N.T. 82.

14. Pa. Const., Article V, § 18(d)(1). This section of the Constitution further provides that a judicial officer is subject to discipline for con-

duct which brings the judicial office into disrepute "whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law."

onical or criminal *automatically* lowers public acceptance of the authority of the judicial office. (Emphasis the Court's). *Id.* at 1238. This Court, therefore, has never presumed that a violation automatically brings the judicial office into disrepute.

Again, in *Smith*, we set down the principle, which we have consistently followed, that "the judicial officer [must have] engaged in conduct which *is so extreme*" that it brings the judicial office into disrepute. *Id.* at 1238. See cases cited in this Court's opinion in *In re Berry*, 979 A.2d 991 (Pa.Ct.Jud.Disc.2009) for a comprehensive study of the factors attendant upon this Court's decisions on whether particular conduct is such that brings the judicial office into disrepute.

In our opinion in *In re Cicchetti*, 697 A.2d 297 (Pa.Ct.Jud.Disc.1997) we held that:

The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.

*Id.* at 312. This enjoinder is hardly surprising and is realistically unavoidable in determining whether particular conduct brings the judicial office into disrepute inasmuch as these cases are driven by the facts and the facts are always different.

These principles for determining whether particular conduct brings the judicial office into disrepute have been approved, indeed adopted by our Supreme Court. *See, In re Berkhimer*, 593 Pa. 366, 372–73, 930 A.2d 1255, 1258–59 (2007) and *In re Cicchetti*, 560 Pa. 183, 206–07, 743 A.2d 431, 443–44 (2000).

In assessing whether the facts of this case are so extreme as to be such that bring the judicial office itself into disrepute—such that "lowers public perception of the authority of the judicial office" *see, Smith* at 1238, we consider the following to be important:

— Respondent's possession of the gun was entirely legal,[15]

— Respondent, did not threaten Baldelli and Tanner with the gun,

— Respondent never pointed the gun at Baldelli or Tanner or at their vehicle,

— as a matter of fact, we believe Respondent took particular care *not* to point the gun at Baldelli or Tanner or at their vehicle,

— the incident as described by Baldelli, Tanner and Respondent had escalated to a point where it was reasonable for Respondent to have been concerned, worried, even scared [16] that it would continue or escalate further,

— under the circumstances it was not unreasonable for Respondent to think that showing Baldelli and Tanner that he had a gun in his possession would prevent further escalation and end the episode,

— Respondent's display of the gun lasted only 2–3 seconds,[17]

---

15. The Pennsylvania Firearms Licensing Law provides:

"(a) Purpose of License.—A license to carry a firearm shall be for the purpose of carrying a firearm on or about one's person, or in a vehicle throughout this Commonwealth."

We are reminded of how ordinary it is, on the roads of Pennsylvania, to see pickup trucks with rifles or shotguns, all shapes and makes of firearms, hanging on gun racks, all in plain view,

16. Respondent testified that it crossed his mind, given the large number of people from Erie who attend Steelers' games, that the driver of the car (Baldelli) might have been someone he put in jail. (N.T. 80).

17. In *Cicchetti*, by contrast, one of the elements of Cicchetti's conduct which was im-

— after the 2–3 seconds the episode was over and Baldelli, Tanner and Respondent proceeded peacefully to Erie.

After scrutinizing and weighing the circumstances of the case, we find that the Board has not established by clear and convincing evidence that Respondent's conduct was so extreme so as to constitute conduct which brings the judicial office into disrepute.

■ (2) The Board also charges that the conduct described in Findings of Fact Nos. 15–25 is a violation of Rule 2A of the Rules Governing Standards of Conduct of Magisterial District Judges because, by engaging in such conduct, Respondent failed to comply with the law.

The full text of Rule 2A is as follows:

A. Magisterial district judges shall respect and comply with the law and shall conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Magisterial district judges shall not allow their family, social or other relationships to influence their judicial conduct or judgment. They shall not lend the prestige of their office to advance the private interest of others, nor shall they convey or permit others to convey the impression that they are in a special position to influence the judge.

No determination of this charge can be made without reference to the case of *In re Harrington*, 877 A.2d 570 (Pa.Ct.Jud. Disc.2005) and especially to the Supreme Court's Order in that case on appeal from this Court, 587 Pa. 407, 899 A.2d 1120 (2006).

In *Harrington* this Court held that Harrington was subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution for conduct such that brings the judicial office into disrepute. On appeal the Supreme Court affirmed that holding, but in its Order doing so, the Supreme Court noted its disapproval of our holding that Harrington's conduct had violated a law and thus was a violation of Rule 2A which requires magisterial district judges to "comply with the law." The Supreme Court disapproved our holding that Harrington had violated Rule 2A because her conduct, though illegal, "did not implicate the decision-making process," citing *In re Cicchetti*, 560 Pa. 183, 743 A.2d 431 (2000). We recognize that the Supreme Court's disapproval of our holding that Harrington's conduct was a violation of Rule 2A was dictum, however, the Court's disapproval is stated without equivocation and with no observable hesitation. In these circumstances we are strongly constrained to make our holding here in concord with the Supreme Court's announced position, and so we hold that the Board has not established a violation of Rule 2A because this Respondent's conduct involving the handgun did not implicate the decision-making process.[18]

---

portant in persuading us in that case that Cicchetti's conduct was so extreme as to be such that brings the office into disrepute was that it was "so persistent," *Cicchetti, supra* at 312.

18. Any contention here arises not so much from the Supreme Court's interpretation of Rule 2A as from the mysterious and inexplicable construction of Section 17(b) of Article V of the Pennsylvania Constitution. That section provides:

"(b) Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court. Justices of the peace shall be governed by roles or canons which shall be prescribed by the Supreme Court."

It is obvious that in this section of the Constitution "justices and judges" are treated separately from "justices of the peace" (now "magisterial district judges") and the section

In view of this holding, it is not necessary for us to decide whether Respondent violated some law when he showed the gun to Baldelli and Tanner, because, even if that conduct did violate some law, it would not be a violation of Rule 2A because that conduct did not implicate the decision-making process.

F. *Allowing a Relationship to Influence Respondent's Judicial Conduct or Judgment and Lending the Prestige of his Office to Advance the Private Interest of Others*

### Discussion

In making this charge in Count 5 of the Complaint, the Board refers to two portions of Rule 2A which deal with different conduct so we will address them separately. Both of the charges in Count 5 can be disposed of out of hand.

■ (1) In Count 5 the Board first asserts that Respondent's association with the Anti–Graffiti Task Force was a violation of the second sentence of Rule 2A. That sentence provides:

> Magisterial district judges shall not allow their family, social or other relationships to influence their judicial conduct or judgment.

Initially, we point out that any conduct meeting the description of this language of Rule 2A would, *ipso facto,* have to have occurred in the "decision-making process"

so we are required to address the underlying question of whether Respondent allowed his relationship with the Anti–Graffiti Task Force to influence his judicial conduct or judgment.

We pointed out earlier that no case ever came before this Respondent involving the Anti–Graffiti Task Force or where graffiti was even involved.[19] It follows, incontestably, we think, that if Respondent was never called upon to exercise his judicial conduct or judgment in a graffiti case, he never had an opportunity to "allow" that conduct or judgment to be influenced.[20] There is no evidence whatsoever to support this charge.

■ (2) In Count 5 the Board asserts yet another way that Respondent has violated Rule 2A. The Board asserts that Respondent's association with the Anti–Graffiti Task Force was a violation of that language of the Rule that provides:

> [Magisterial district judges] shall not lend the prestige of their office to advance the private interest of others....

The trouble with this charge is that in 2008, in the City of Erie, graffiti and the Anti–Graffiti Task Force was a *public* interest. All the evidence establishes that. Erie Mayor Sinnott called a press conference to announce its formation, and appointed Respondent to lead it.[21] Members of the Task Force included John Tretter, business agent for Laborers Union Local 603, downtown businessman Tom "Tippy"

---

simply does not prohibit magisterial district judges from engaging in "activity prohibited by law." In *In re Harrington,* 877 A.2d 570 (Pa.Ct.Jud.Disc.2005) we said: "It might reasonably be said that if justices of the Supreme Court and judges of our courts of common pleas and of our appellate courts are forbidden from engaging in activity prohibited by law, then district justices certainly should be. That may well be, but no massaging of the rules of statutory construction can rehabilitate Count 1 [charging a violation of Section

17(b)] because the plain language of § 17(b) precludes it." *Id.* at 574.
　　Section 17(b) begs for amendment.

**19.** See p. 12–13, *supra.*

**20.** This holding should not be seen to imply that a mere showing that graffiti cases did come before Respondent would be enough to establish a violation of 2A.

**21.** Board Exhibit No. 3.

Dwardanski, Wally Brown, coordinator of the Little Italy Neighborhood Crime Watch Group, David J. Grabelski, assistant professor at the Institute for Intelligence Studies at Mercyhurst College and Maria R. Garase, assistant professor at Gannon University, Criminal Justice Program.[22] Those taking active part in the activities of the Task Force included CSX, the Erie Metropolitan Transit Authority, the United States Postal Service, PennDOT, Sherwin–Williams, Home Depot as well as volunteers from local colleges, non-profits and the City of Erie and other local businessmen.[23] The activities of the Task Force were given generous coverage in the Erie newspapers and on television,[24] Graffiti—its existence and its proliferation—is clearly a public issue and efforts by the Anti–Graffiti Task Force to eradicate graffiti or control it are certainly of public interest—not private.

We hold that the Board has not established that by his association with the Anti–Graffiti Task Force Respondent was lending the prestige of his office to advance the private interest of others.

Even if we were to hold that Respondent's association with the Anti–Graffiti Task Force did lend the prestige of his office to a *private* interest, since this conduct was not such that would have occurred in the "decision-making process," it would not be a violation of Rule 2A. Everything we said earlier about the Supreme Court's Order in the *Harrington* case and Rule 2A applies to this conduct as well because this conduct was not connected to the "decision-making process."

We also hold that the conduct here involved is not such that brings the judicial office into disrepute and thus was not a violation of the Pennsylvania Constitution, Article V, § 18(d)(1).

## III. CONCLUSIONS OF LAW

1. The Board has failed to establish by clear and convincing evidence that the conduct of Respondent violated Rules 6, 8A(1), 11 and 2A of the Rules Governing Standards of Conduct of Magisterial District Judges or that the conduct of Respondent was such that brings the judicial office into disrepute in violation of Article V, § 18(d)(1) of the Pennsylvania Constitution as charged in the Complaint in Counts 1–7, such as would subject this Respondent to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

### ORDER

PER CURIAM.

AND NOW, this 26th day of May, 2011, based upon the Opinion filed herewith, it is ORDERED:

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law be and it is hereby filed, and shall be served upon the Judicial Conduct Board and upon Respondent,

That either party may elect to file written objections to the findings and conclusions of the Court, stating therein the basis for those objections, provided that such objections shall be filed with the Court within ten (10) days of the date of the entry of this Order, and a copy thereof served upon the opposing party,

That, in the event such objections are filed, the Court shall determine whether to entertain oral argument upon the ob-

---

**22.** Board Exhibit No. 4.

**23.** Board Exhibit No. 7.

**24.** Board Exhibits Nos. 3, 4, 7 and Board Complaint, para. 10.

jections, and issue an Order setting a date for such oral argument, and

That, in the event that timely objections are not filed within ten (10) days, or the Court decides that oral argument shall not be presented, this Court will issue an Order dismissing the Board's Complaint.

## ORDER

AND NOW, this 8th day of June, 2011, it is hereby ORDERED that such Orders entered in the above case on June 7, 2011 are hereby VACATED. Inasmuch as no objections were filed to the Order of Court and Opinion filed on May 26, 2011, the Complaint against respondent is DISMISSED.