**Gregory James SMITH, Appellant,**

v.

**Sheriff Carl E. NACE.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 31, 2003.
Decided May 27, 2003.

---

Jerry A. Philpott, Duncannon, for appellant.

Allan W. Holman, Jr., New Bloomfield, for appellee.

BEFORE: McGINLEY, Judge, SMITH–RIBNER, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge McGINLEY.

Gregory James Smith (Smith) appeals from the order of the Court of Common Pleas of the 41st Judicial District (Perry County Branch) (common pleas court) which affirmed the Sheriff of Perry County's (Sheriff) revocation of Smith's concealed weapons permit (permit).

On April 4, 2002, around 3:30 p.m. Smith was driving north on Routes 11/15. Traffic from Interstate 81 merged with traffic from Routes 11/15 going from two lanes to one at a "bottleneck" or "choke point" (bottleneck). Smith was in the left lane. Mike Maitland (Maitland) exited Interstate 81 South onto Routes 11/15 and merged into the right lane. He proceeded to the bottleneck where the right lane ends, encountered Smith who was in the left lane and attempted to merge. Smith sped up and prevented him. Then, Smith waved a gun through the air and slammed it on the dashboard of his vehicle. Maitland pulled in behind Smith, called 911 and reported the incident.

In response to the 911 call Trooper Michael Paul Hogan (Trooper Hogan) of the Pennsylvania State Police intercepted Smith as he pulled into a gasoline station. Trooper Hogan saw the gun on the seat of the car, interviewed Smith, and after he determined Smith had a permit, let him go. Trooper Hogan reported the incident and Smith's demeanor during the interview to the Sheriff. The Sheriff revoked Smith's permit by letter. Smith appealed the revocation to the common pleas court.

At a hearing held on June 27, 2002, Maitland testified:

I proceeded to the choke point where I came upon this gentleman in the gray Nissan, and we were sort of neck and neck going about two miles an hour roughly and he kept speeding up. He obviously wasn't going to let me in. That was fine. I was in no big hurry. And I could just—I could just see his frustration as he was shaking his head back and forth over the fact that maybe I was trying to get in front of him or whatever.

And, at that point, I looked over at him, and we were no further apart than maybe 15 or 20 feet at the most, and I saw him reach down. He lifted up a gun. He held it up in the air. Waived [sic] it a couple times and then slammed it on

his dashboard. So and then he sped up his vehicle and I pulled along behind him.

And, at that point, I could see him looking at me in the rearview mirror. I could see his lips moving, but I obviously couldn't tell what he was saying but clearly he was a little PO'd. And then at that point I called 911.

Notes of Testimony, June 27, 2002, (N.T.) at 4–5; Reproduced Record (R.R.) at 5a–6a.

Trooper Hogan testified to events at the gasoline station. When he walked back to the car Smith was still in the driver's seat. "When I looked down the handgun was on the seat and under his thighs." N.T. at 13; R.R. at 14a. Trooper Hogan reported Smith was defensive, argumentative and sarcastic during the interview. N.T. at 14; R.R. at 15a. When asked why he didn't have a holster for the gun, Smith replied he didn't need one. When asked why he carried a gun, Smith replied "Why do you carry a gun?" N.T. at 14; R.R. at 15a. Trooper Hogan called the Sheriff at home to describe the incident, something he had never done before. N.T. at 15; R.R. at 16a.

Smith testified that he normally carries his gun in the small of his back and drives a pickup truck so that that manner of carrying the gun does not bother him. He put it under his thigh so it would not slide. N.T. at 28; R.R. at 29a. He testified that his only awareness of Maitland was a brown BMW that started to tailgate him. N.T. at 26; R.R. at 27a. He admitted that he moved the gun from behind his back to the seat, but denied waving the gun. N.T. at 27; R.R. at 28a. Smith stated he did not put the gun on the dashboard because

he could not reach the dashboard and the dashboard was sloped so the gun would not have stayed. N.T. at 28; R.R. at 29a. He denied being sarcastic with Trooper Hogan. N.T. at 29; R.R. at 40a.

Smith presented evidence that he was a certified NRA instructor and offered testimony that established there were no character issues that should prevent him from carrying a handgun. N.T. at 29; R.R. at 30a.

The common pleas court affirmed the revocation. "[I]n this particular situation he [Smith] did in fact act inappropriately to the traffic situation ... [h]e demonstrated poor judgment by in essence utilizing the firearm to impress or perhaps threaten the witness." Common Pleas Court Opinion, July 24, 2002, at 4; Certified Record (C.R.) at 8.

■ Before this Court, Smith argues that the incident was not sufficient for revocation of his permit. Smith contends that the Sheriff may not revoke a concealed weapon permit on grounds that the permit holder's character and reputation is such that he would act in a manner dangerous to the public based solely on (1) the report of a motorist in a nearby vehicle that the permit holder was waving his weapon; (2) a sarcastic attitude towards an officer who stopped the permit holder; and (3) a perception that the permit holder had an angry state of mind.[1]

Section 6109(i) of the Uniform Firearms Act (the Act) states "[a] license to carry firearms may be revoked by the issuing authority for good cause. A license to carry firearms shall be revoked by the issuing authority for any reason stated in subsection (e)(1) which occurs during the

---

1. This Court's review is limited to determining whether the trial court abused its discretion, whether it committed an error of law or whether a violation of constitutional rights occurred. *Tsokas v. Board of Licenses and Inspections Review*, 777 A.2d 1197, 1200 n. 1 (Pa.Cmwlth.2001).

term of the permit." 18 Pa.C.S. § 6109(i). Subsection (e)(1)(i) provides "[a] license shall not be issued to any of the following: (i) an individual whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety." 18 Pa.C.S. § 6109(e)(1)(i).

Smith argues that prior dangerous conduct accompanied by verbal threats is required to support a revocation. *Tsokas,* 777 A.2d at 1201; *Gardner v. Jenkins,* 116 Pa.Cmwlth. 107, 541 A.2d 406 (1988).

Smith contends that character and reputation are also relevant and in this instance the Sheriff did not check out Smith's character and reputation. The sole basis for the revocation was that Maitland reported that Smith was waving his weapon around. Smith acknowledged he moved the handgun from the small of his back to the seat beside him, but questions what Maitland saw through the tinted windows of the vehicle.

Smith argues these actions were not as significant as in those cases where this Court upheld revocations. In *Gardner,* Irving Gardner was found of unfit character because there was evidence that Gardner had been involved in a prior dispute over plumbing work and had waved a .357 Magnum gun at the plumbers as he informed them "this is how he gets his work done." *Gardner,* 541 A.2d at 409. Smith argues that this situation was a clear threat, not the simple shifting of a handgun from an uncomfortable resting place to a different position.

In *Tsokas,* Michael Tsokas had his license revoked based upon evidence that he had been involved in numerous encounters over a period of years. Tsokas brandished his handgun, threatened to shoot two men, showed his gun to children playing, and "pulled his gun on an individual whom he perceived to be breaking in ... telling the individual that if he doesn't leave, I'll blow your brains out." *Tsokas,* 777 A.2d at 1199.

Smith argues that in contrast Maitland made no claim that Smith verbally threatened him. Smith claimed he was not even aware of Maitland until he saw him in his rearview mirror talking on the cell phone. This encounter was not face to face in a confined space as in *Gardner.* Smith claims there is no evidence that Smith threatened anyone, and he merely made the gun visible.

Next, Smith argues that the sarcasm perceived by Trooper Hogan was not a sufficient basis for revocation. Smith maintains that other than his responses his behavior was polite and cooperative.

A review of *Gardner* and *Tsokas* discloses that it is for the sheriff to determine the fitness of an individual to carry weapons. Each case is decided on its own facts and there is no fixed rule to determine fitness. *Gardner,* 541 A.2d at 409. "Clearly the legislature intended to confer discretion upon police chiefs or sheriffs to determine whether an applicant should be licensed, and this principle applies with equal force to a determination of good cause for the revocation of a license granted under the Act." *Tsokas,* 777 A.2d at 1202.

■ Accordingly, the sheriff determined this incident represented a case of road rage, and that Smith presented a danger to public safety. Here, the Sheriff investigated the incident and found Smith knew Maitland was driving next to him and wanted to merge. Smith sped up each time Maitland tried to merge. Maitland observed Smith's frustration and saw him shaking his head back and forth. Smith drew his firearm, held it in the air, waved it and then slammed it on the dashboard. This Court finds the common pleas court

did not err or abuse its discretion when it upheld the revocation.

Accordingly, we affirm.

### *ORDER*

AND NOW, this 27th day of May, 2003, the order of the Court of Common Pleas of the 41st Judicial District of Pennsylvania Perry County Branch in the above-captioned matter is affirmed.