79 A.3d 490

In re Thomas CARNEY, Magisterial District Judge in and for Magisterial District 06–1–03, Erie County, Pennsylvania.

Appeal of Judicial Conduct Board.

Supreme Court of Pennsylvania.

Argued Oct. 17, 2012.

Decided Oct. 30, 2013.

478

Elizabeth Ann Flaherty, Esq., PA Judicial Conduct Board, for Judicial Conduct Board.

Joseph A. Massa Jr., Esq.; PA Judicial Conduct Board, Warren, for Judicial Conduct Board.

David Ridge, Esq., Ridge & McLaughlin, Erie, for Carney, Thomas.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Chief Justice CASTILLE.

This matter comes before the Supreme Court of Pennsylvania following an Opinion and Order by the Pennsylvania Court of Judicial Discipline ("CJD"), dismissing a complaint against appellee, Magisterial District Judge ("MDJ") Thomas Carney, that was filed by the Judicial Conduct Board ("Board"). The Board's complaint alleged that appellee Carney violated Article V, § .18(d)(1) of the Pennsylvania Constitution and Rules 2A and 11 of the Rules Governing Standards of Conduct of Magisterial District Judges (hereafter "MDJ Rule" or "MDJ Rules").[1] Following the CJD's dismissal of the Board's complaint, the Board appealed to this Court, arguing that the CJD erred in concluding that appellee did not violate any of the enumerated provisions. For the reasons stated herein, we reverse in part and affirm in part the opinion and order of the CJD, and we remand for proceedings consistent with this Opinion.

This matter involves two entirely separate factual grounds for potential discipline. The facts as set forth by the CJD show that appellee has served as the MDJ for Magisterial District 06–1–03, Erie County, Pennsylvania, since January 2, 2006. As an MDJ, he is subject to all duties and responsibili-

1. The Board is not raising a claim on appeal related to the original charges that also alleged a violation of MDJ Rules 6 and 8. The separate factual circumstances surrounding these allegations are not related or otherwise discussed herein.

ties imposed on him by the MDJ Rules and the Pennsylvania Constitution.

The first set of factual grounds relates to appellee's involvement in the City of Erie's Anti–Graffiti Task Force ("task force"). The CJD found that prior to January 5, 2008, Erie Mayor Joseph E. Sinnott announced the formation of a task force, under the direction of appellee, with the goals of identifying, tracking and removing graffiti, making public service announcements, identifying and prosecuting "taggers" [2], and assisting the City of Erie and local businesses in removing graffiti from their property. In an article in the Erie Times–News on January 5, 2008, appellee was quoted as saying: "It's (graffiti) a real problem that's growing worse by the day, especially in the inner city." In that same article, he was also quoted as saying that a local businessman "offered to donate funds to come up with a solution, and many others have volunteered their time, so we're putting together a group to address the problem." In a March 21, 2008 article, the Erie Times–News reported that appellee said that the task force would seek community help in identifying the vandals and would suggest tougher fines for violations. He was also quoted as saying that the task force would "work our hardest to abate it." *See In re Carney*, 28 A.3d 253, 261–62 (Pa.Ct. Jud.Disc.2011).

On June 25, 2008, appellee appeared on the early morning newscast of WJET–TV in Erie, where he engaged in an exchange with a reporter. During that interview appellee discussed a local synagogue, which had recently been vandalized with graffiti. Finally, in an editorial in the Erie Times–News published on July 23, 2008, appellee was identified as a leader of the task force. He was also identified as a "district judge for Erie's 3rd Ward." The editorial stated that appellee had some ideas to "strengthen local anti-graffiti efforts," including establishing a reward fund for "any good Samaritan (who can) help us and assist us." The editorial then stated that "a local businessman has donated $2,000 to start the

---

**2.** A tagger is a person who marks surfaces with graffiti. *See* www. merriam-webster/dictionary/tagger.

reward fund. Call Carney's office at 451–6528 if you can make a contribution." *Id.* at 263.[3]

The second set of factual circumstances relates to an incident occurring on Interstate 79 when appellee displayed a handgun to two occupants of another vehicle. The CJD's findings of fact state that on January 11, 2009, appellee was driving northbound on I–79 on his way home to Erie after having attended a Pittsburgh Steelers football game at Heinz Field in Pittsburgh. Approximately 4–5 miles north of Exit 105 (the Slippery Rock exit), appellee drove up behind a vehicle driven by Nico Baldelli, a freshman at Mercyhurst College–North East. Baldelli's college roommate, Ryan Tanner, was a passenger in the car. Both cars were traveling in the left-hand lane. Appellee indicated that he wanted to pass the students by flashing his high beams. Baldelli continued to drive in the left-hand lane and appellee moved into the right-hand lane to pass Baldelli's vehicle.[4] While passing Baldelli's vehicle, appellee displayed his middle finger to Baldelli and Tanner; as the CJD put it in colloquial terms, appellee "gave [them] the finger." *Id.* at 265.

After appellee passed Baldelli's vehicle, Baldelli moved into the right-hand lane behind him and flicked his high beams. Appellee reduced his speed and Baldelli returned to the left-hand lane and drove up alongside appellee. Baldelli turned on his inside light and raised his middle finger while yelling obscenities. Appellee then increased his speed until his vehicle was approximately alongside the front bumper of Baldelli's car. He then rolled his window half way down, retrieved a silver handgun from the console beside the driver's seat, and held it with his thumb and index finger out the window briefly, for two to three seconds, so that Baldelli could see it. Baldelli backed off and continued northward to Erie at a slower speed. The CJD apparently credited appellee's account of his motivations in displaying the gun to the young men. Thus, in its

3. The editorial is reprinted in the CJD's Opinion and Order, 28 A.3d at 263–64.

4. Baldelli indicated that appellee did not give him sufficient time to get into the right-hand lane before appellee moved into the right-hand lane.

findings of fact, the CJD stated that: "respondent was concerned about the escalation of the incident and displayed the gun in an effort to defuse the situation with the intention (or hope) that showing Baldelli the gun would result in Baldelli 'backing off,' which it did." 28 A.3d at 265.

Baldelli called his parents, who notified the State Police. The State Police then stopped appellee at a point 75 to 80 miles north of the location where he had displayed his handgun. The State Police initially filed four misdemeanor charges against appellee, including terroristic threats, simple assault, disorderly conduct, and recklessly endangering another person. The charges were subsequently dismissed by Magisterial District Judge Lorinda L. Hinch of Magisterial District 35–3–01, Mercer County. The State Police later refiled two misdemeanor counts each of the same four charges. On November 10, 2009, appellee pled guilty to two lesser, summary offenses of disorderly conduct and was ordered to pay fines and costs totaling $541. In exchange for the plea, the Mercer County District Attorney's Office dropped the other charges. *Id.* at 266.

Appellee had a concealed weapon permit to carry the firearm he displayed, which was identified as a Walther PPK 38 9 mm caliber handgun. Appellee explained that he obtained the handgun because his office regularly received large amounts of cash, which he would be required to take to the bank through a neighborhood of "drug dealers, prostitutes and crazy bars." *See id.*

The Board filed a complaint against appellee based on the above-summarized separate incidents. The Board alleged, in relevant part here, that appellee had solicited funds for the task force in violation of MDJ Rule 11, displayed a handgun out of his car window in violation of MDJ Rule 2A and Article V, § 18(d)(1) of the Pennsylvania Constitution, and allowed a relationship to influence his judicial conduct or judgment and lent the prestige of his office to advance the private interests of others in violation of MDJ Rule 2A.[5]

5. Article V, § 18(d)(1) of the Pennsylvania Constitution permits an MDJ to be disciplined for certain misconduct as follows:

The parties submitted stipulations to certain facts and the case went to trial before the CJD. Testifying at trial was Nico Baldelli, State Trooper Victoria R. Weibel (the officer who initially spoke with Baldelli and Tanner), appellee, and State Trooper Robert J. Soros (the officer who interviewed appellee after the handgun display incident with counsel's permission). The court also accepted the submission of the transcript of Ryan Tanner's preliminary hearing testimony before MDJ Hinch.

Following trial, the CJD issued the findings of fact recounted above and conclusions of law. On consideration of the arguments related to the solicitation of funds for the task force, the CJD concluded that the Board's case for a violation of Rule 11 was premised entirely on a newspaper editorial. Furthermore, the CJD concluded that the Board took the quoted portion of the editorial out of context. When viewed in context, the CJD determined, it was clear that appellee had not made any of the objected-to statements. Instead, the

> A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for ... neglect or failure to perform the duties of office or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute, whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law; or conduct in violation of a canon or rule prescribed by the Supreme Court.

Rule 2A of the MDJ Rules imposes the following rules of conduct upon an MDJ:

> Magisterial district judges shall respect and comply with the law and shall conduct themselves at all times in a manner that promotes public confidence in the integrity and impartiality of the judicial. Magisterial district judges shall not allow their family, social or other relationships to influence their judicial conduct or judgment. They shall not lend the prestige of their office to advance the private interests of others, nor shall they convey or permit others to convey the impression that they are in a special position to influence the judge.

Rule 11 of the MDJ Rules prohibits an MDJ from soliciting funds as follows:

> Magisterial district judges shall not solicit funds for any educational, religious, charitable, fraternal or civic organization, or use or permit the use of the prestige of their office for that purpose, but they may be listed as an officer, director or trustee of such an organization. They shall not be a speaker or the guest of honor at such an organization's public fund raising events, but they may attend such events.

statements were made by the author of the editorial. The CJD further noted that appellee had denied ever asking for donations or soliciting funds and the court "believe[d] him." *Carney*, 28 A.3d at 265. The CJD also determined that appellee's involvement in the task force did not violate Rule 2A by lending the prestige of his office to a private interest because the eradication of graffiti was a matter of public interest. "Graffiti—its existence and its proliferation—is clearly a public issue and efforts by the Anti–Graffiti Task Force to eradicate graffiti or control it are certainly of public interest—not private." *Id.* at 270.

The CJD then turned to the gun waving incident, suggesting that in order to violate Section 18(d)(1) of Article V of the Pennsylvania Constitution, PA. CONST. art. V, § 18(d)(1), the judicial officer must have engaged in conduct which is "so extreme" that it brings the office itself into disrepute. The CJD then reasoned that the following factors weighed in favor of appellee: he legally possessed the gun; he did not threaten Baldelli and Tanner with the gun; he never pointed the gun at the young men or their vehicle, but rather "took particular care" not to point it; the incident as described by all three participants had escalated to a point where it was reasonable for appellee to have been "concerned, worried, even scared that it would continue or escalate further;" it was not unreasonable for appellee to believe that showing the gun "would prevent further escalation and end the episode;" the display of the gun lasted only 2–3 seconds; and everyone "proceeded peacefully" to Erie after appellee displayed the gun. The CJD concluded that the Board failed to establish by clear and convincing evidence that appellee's conduct "was so extreme" as to bring the judicial office into disrepute in violation of the Pennsylvania Constitution. *Carney*, 28 A.3d at 266–68.

The CJD then considered whether the gun waving incident violated Rule 2A of the MDJ Rules. Citing prior case law from this Court, the CJD noted that the conduct had to implicate the judicial "decision-making process" in order to violate Rule 2A. *See In re Harrington*, 587 Pa. 407, 899 A.2d 1120 (2006) (*per curiam* order); *In re Cicchetti*, 560 Pa. 183,

743 A.2d 431 (2000). The CJD concluded that, "[i]n view of this holding, it is not necessary for us to decide whether [appellee] violated some law when he showed the gun to Baldelli and Tanner, because, even if that conduct did violate some law, it would not be a violation of Rule 2A because that conduct did not implicate the decision-making process." *See Carney*, 28 A.3d at 268–69.[6]

The Board appealed the decision directly to this Court.

■■■■ This Court has exclusive jurisdiction over appeals from the CJD pursuant to 42 Pa.C.S. § 725(2) and PA. CONST. art. V, § 18(c)(1).[7] This Court's scope of review over such appeals is governed by the Pennsylvania Constitution, which provides that the Court shall review the record of the proceeding as follows: "on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and as to sanctions, the scope of review is whether the sanctions imposed were lawful. The Supreme Court or special tribunal may revise or reject an order of the court upon a determination that the order did not sustain this standard of review; otherwise, the Supreme Court or special tribunal shall affirm the order of the court." PA. CONST. art. V, § 18(c)(2). However, the Constitution limits this Court's review of appeals by the Board, such as this one, to questions of law, stating that "an order which dismisses a complaint ... may be appealed by the board to the Supreme Court, but the appeal shall be limited to questions of law." *Id.* at § 18(c)(3). Our scope of

**6.** The CJD noted that the dispute here did not arise so much from this Court's interpretation of Rule 2A as from the "mysterious and inexplicable construction of Section 17(b) of Article V of the Pennsylvania Constitution." Explaining further, the CJD noted that Section 17(b) makes a distinction between "justices and judges" and "justices of the peace" (now MDJs), providing that the former "shall not engage in activity prohibited by law," while merely providing that the latter "shall be governed by rules or canons ...," but not expressly prohibiting justices of the peace from engaging in activity prohibited by law. PA. CONST. art. V, § 17(b); *Carney*, 28 A.3d at 268 n. 18.

**7.** Section 725 gives this Court exclusive jurisdiction over appeals from final orders of certain constitutional and judicial agencies including: "(2) Court of Judicial Discipline, except matters within the exclusive jurisdiction of a special tribunal as established under Section 18(c)(1) of Article V of the Constitution of Pennsylvania...." 42 Pa.C.S. § 725.

review over questions of law raised by the Board is plenary and our standard of review over questions of law is *de novo. Mercury Trucking, Inc. v. Pennsylvania Public Utility Com'n*, 55 A.3d 1056, 1082 (Pa.2012). That is, although we accept the factual findings and credibility determinations made by the lower tribunal, we need not defer to the legal conclusions.

The Board's first argument relates to the gun display incident and avers that appellee's conduct was improper and was "so extreme" that it adversely affected not only appellee's reputation but also the reputation of the judicial office itself in violation of Article V, Section 18(d)(1). Brief of Judicial Conduct Board, at 13–14 citing *In re Berkhimer*, 593 Pa. 366, 930 A.2d 1255, 1258 (2007). The Board asserts that the standard for measuring disrepute is the reasonable expectations of the public. According to the Board, judicial officers have been sanctioned for conduct "far less egregious" than the conduct in this case. For example, the Board points to *In re Marraccini*, 908 A.2d 377, 382 (Pa.Ct.Jud.Disc.2006), where the CJD found that an MDJ violated Section 18(d)(1) when he waved his hands in a dismissive gesture towards approximately twenty defendants (for traffic citations) and asked them if they "were all morons" when they asked whether they were excused. The Board also compares the circumstances here to *Harrington, supra*, where an MDJ parked at expired parking meters and placed parking tickets from other vehicles on her car in order to deceive the local parking authority. The *Harrington* Court concluded that the MDJ violated the "disrepute" proscription in Section 18(d)(1). Finally, the Board likens this case to *In re Hamilton*, 932 A.2d 1030 (Pa.Ct.Jud. Disc.2007), where the CJD found a violation of Section 18(d)(1) based upon an MDJ assaulting a police officer and speaking profanely to the officer's wife. Based on these prior cases, the Board asserts that, accepting the factual findings made by the CJD, this Court should find that appellee's conduct in displaying a loaded handgun during a "childish escalating episode of road rage" was so extreme as to implicate the proscription against disrepute.

The Board further explains why it believes that the CJD's purported factual finding that appellee "did not threaten" or endanger the young men was improper. The Board argues that whether or not appellee legally possessed the handgun was irrelevant because it was appellee's inappropriate and threatening use of the handgun that was the source of the disrepute. According to the Board, appellee's conduct, like that of the judicial officer in *Harrington,* is the type of behavior that would cause an ordinary person to believe that some judges consider themselves to be above the law. The Board also notes that a similar incident in Pennsylvania resulted in the revocation of a gun license, and a similar incident in another state resulted in attorney discipline. Brief of Judicial Conduct Board, at 20–21, *citing Smith v. Nace,* 824 A.2d 416 (Pa.Cmwlth.2003) and *In re Ervin,* 387 S.C. 551, 694 S.E.2d 6 (2010).

Turning to the separate proscriptions in the MDJ Rules, the Board next argues that this case provides the Court with an opportunity to reconsider prior decisions interpreting Rule 2A and to clarify that criminal acts committed by an MDJ, whether on or off the bench, may be subject to discipline. The Board points out that the plain language of Rule 2A clearly requires an MDJ to "respect and comply with the law." The Board recognizes the *Cicchetti* Court's interpretation of Canon 2A of the Code of Judicial Conduct (the provision similar to Rule 2A applied to MDJs), which limits application of Canon 2A to instances where the misconduct implicates the actual judicial decision-making process. The Board submits, however, that this non-textual limitation frustrates the purpose of the rule and has effectively deprived the CJD of the power to enforce it. The Board asserts that *Cicchetti* has led to incongruous results in judicial disciplinary matters in the form of repeated determinations that a judicial officer violated Article V, Section 18 of the Constitution, but did not violate Canon 2 or Rule 2A. *See Harrington, supra; see also In re Murphy,* 10 A.3d 932 (Pa.Ct.Jud.Disc.2010) (finding that forgery by MDJ violated Section 18, but not Rule 2A, because pursuing disciplinary charge under Rule 2A "would be in

direct conflict with *Harrington.*"). The Board concludes that appellee committed a crime when he displayed the handgun, that it proved by clear and convincing evidence that he did not comply with the laws of Pennsylvania, and that he therefore was in violation of the plain language of Rule 2A. Finally, the Board notes that it continues to pursue charges under Rule 2A and Canon 2 because it is unconscionable that criminal conduct by judicial officers should not be disciplined under these Rules merely because the criminal conduct does not implicate the decision-making process.[8]

The Board separately addresses appellee's participation in the anti-graffiti task force and contends that the CJD erred in concluding that appellee's conduct as chairman of the task force did not lend the prestige of his office to advance the private interests of others in violation of Rule 2A. The Board asserts that the linchpin of the CJD's analysis was in error, since graffiti is both a public and a private concern. Graffiti affects private and public property; local businesses, *i.e.,* private businesses, were affected by graffiti. Thus, according to the Board, the work of the task force benefitted private interests. The Board further emphasizes that members of the private business community were on the task force and the CJD ignored that there were substantial private interests which benefitted from the task force. The Board contends that the task force contributed its resources and labor to clean up privately owned buildings, including a synagogue. In the Board's view, "By announcing his support in combatting graffiti at clearly private facilities, [appellee] championed the cause of private interests." Brief of Judicial Conduct Board, at 43. The Board adds that appellee admitted that he announced to the public via media outlets that if people observed graffiti, they should report it by calling his judicial office. Such calls

8. The Board adds an implausible argument, asserting that even if this Court were to reaffirm that a violation of Rule 2A must implicate the decision-making process, appellee's misconduct here qualifies because he erroneously believed that the act of displaying the handgun was legal as a means of self-defense. The Board posits that appellee's position demonstrates a misunderstanding of Pennsylvania justification law and implicates his ability to correctly decide judicial matters. Given our disposition, we need not address this argument further.

were received by his judicial staff and were unrelated to his duties as an MDJ.

The Board next argues that the CJD erred when it concluded that appellee did not solicit funds for the task force in violation of Rule 11. The Board contends that solicitation includes in-kind donations, such as time and materials. The Board asserts that appellee sought in-kind contributions from the citizens and the business community of Erie by making statements seeking such contributions that were quoted in the local newspaper in violation of Rule 11. The Board further avers that appellee was identified as a "district judge for Erie's 3rd Ward" rather than as the chairman of the task force in these articles. The Board notes that the newspaper reported that appellee had the idea to establish a reward fund and a local businessman had donated $2,000 to start the fund. The Board argues that appellee's conduct in seeking in-kind donations violated Rule 11.

Finally, the Board argues that appellee's involvement in the task force also violated Article V, Section 18 of the Pennsylvania Constitution. According to the Board, appellee lent the prestige of his office to further his personal interest in eliminating graffiti in Erie. Viewed collectively, the Board submits, the acts discussed above brought disrepute upon the judicial office because they constituted a part of "a concerted effort by [appellee] to advance objectives that are forbidden by the ethical rules that govern his conduct as a magisterial district judge." Brief of Judicial Conduct Board, at 52.

Appellee responds that his guilty plea to two counts of disorderly conduct, which were graded as summary offenses, was not misconduct which was so extreme as to bring the judicial office into disrepute for purposes of Article V, Section 18(d)(1). Appellee avers that the CJD's findings of fact and credibility determinations are supported by the facts of record. The only remaining question is whether the Board proved by those findings that appellee's conduct was improper and was so extreme that it adversely affected appellee's reputation and the reputation of the judicial office itself. Brief of Appellee, at 11, citing *Berkhimer, supra.* Appellee

argues that the Board's appellate challenge attempts to relitigate the facts in violation of the scope of review. Appellee distinguishes *Hamilton*, pointing out that the case involved an assault on a police officer without legal provocation and the use of language which was intended to humiliate the officer's wife. In contrast, here, there was no physical confrontation or harm inflicted upon an innocent victim.

Turning to the charges premised upon the MDJ Rules, appellee next argues that *Cicchetti* and *Harrington* should be reaffirmed. According to appellee, *Cicchetti* involved "hybrid" misconduct because there was an overlap between the inappropriate conduct—alleged sexual misconduct, the most significant of which involved complaints from a female probation officer assigned to the male judge's courtroom—and the judge's responsibility to serve on the bench with independence and integrity. Here, appellee submits, his display of his handgun on the highway involves no such overlap. In appellee's view, Rule 2A properly requires that any judge will be held to a very high standard for any action that affects his ability to dispense justice, and there are other mechanisms for sanctioning out-of-court conduct or conduct that does not implicate the judicial decision-making process. Appellee thus argues that it is not necessary that Rule 2A be available to impose sanctions upon offending judges for out-of-court conduct. Finally, appellee notes that MDJs are subject to election every six years and may be voted out if off-duty conduct brings the judicial office into disrepute.

Appellee separately addresses his participation in the anti-graffiti task force and asserts that his statements bringing public attention to the problems associated with graffiti and the work and mission of the task force did not violate Rules 2A or 11. Appellee argues that graffiti is a community problem and the formation of and work of the task force serves the community and the public good. Appellee also asserts that the Board provided no evidence that any private business owner or interest was benefitted by the task force. Appellee concludes that the Board's argument related to the advancement of private interests is convoluted and absurd and

contradicts the CJD's determination that, "[t]he trouble with this charge is that in 2009[sic], in the City of Erie, graffiti and the Anti–Graffiti Task Force was a public interest." Brief of Appellee, at 22, quoting *Carney*, 28 A.3d at 269. Appellee posits that if the Board's argument is taken to its logical conclusion, then no judges or MDJs could participate in any type of public organization.

Appellee then asserts that the Board failed to prove that he solicited funds because the Board's entire case related to this charge was based on a newspaper editorial. According to appellee, the CJD properly concluded that the language related to appellee was not based on quotes from him but reflected what the paper wrote. Additionally, appellee points out that the CJD specifically credited appellee's statement that he had never solicited any funds on behalf of the task force, and the CJD's conclusion was further supported by appellee's testimony that the task force did not even have a bank account. For all of these reasons, appellee asks this Court to affirm the CJD's dismissal of disciplinary charges.

## I

## A

The first issue involves the CJD's conclusions with regard to the gun waving incident and whether appellee's conduct violated Article V, Section 18(d)(1) of the Pennsylvania Constitution. The CJD concluded that the Board did not prove a violation of the constitutional provision by clear and convincing evidence.

■ Section 18 provides specific guidelines for when a justice, judge or justice of the peace may be removed from office or otherwise sanctioned. Such discipline is authorized for, *inter alia*, conduct which "prejudices the proper administration of justice or brings the judicial office into disrepute, whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law." PA. CONST. art. V, § 18(d)(1). Before the CJD, the Board must prove the charges by clear

and convincing evidence. *In re Merlo,* 619 Pa. 1, 58 A.3d 1, 8 (2012).

The Board does not allege that this particular extrajudicial conduct implicates the administration of justice; it focuses solely on the disrepute provision. This Court has cited with approval to the CJD's definition of disrepute as "necessarily incorporating some standard with regard to the reasonable expectations of the public of a judicial officer's conduct," as well as the CJD's case-by-case approach to determinations of whether conduct implicates the proscription. *See In re Berkhimer,* 930 A.2d at 1258 (citations omitted); *see also Merlo,* 58 A.3d at 10. The *Berkhimer* Court also approved the CJD's admonition in a prior case that disrepute necessarily includes consideration of whether the public's perception of the judiciary as a whole has been affected by the alleged misconduct:

> [T]he conduct of a judge which results in a decline in the public esteem for that judge, may not support the conclusion that the conduct has brought the judiciary as a whole into disrepute, absent a persuasive showing by the Board that the conduct is so extreme as to have brought the judicial office itself into disrepute.

*Berkhimer,* 930 A.2d at 1258 (quoting *In re Zupsic,* 893 A.2d 875, 888 (Pa.Ct.Jud.Disc.2005)); *see also Merlo,* 58 A.3d at 10 (difficulty is not in determining whether conduct is "bad" or "reprehensible," but whether it makes judges *collectively* look bad) (emphasis original). Disrepute may result where the actions took place inside or outside of court proceedings. *Berkhimer, supra.*

Examples of conduct found to be "so extreme" as to bring the judiciary as a whole into disrepute include the use of vulgar and sexually charged language and frequent use of expletives directed at employees, *Berkhimer, supra;* a male judge behaving improperly to litigants and female staff, *Cicchetti, supra;* attempting to influence judicial outcomes, *Zupsic, supra;* provoking a fight at a golf outing, *Hamilton, supra;* and parking at expired parking meters, but displaying parking tickets issued to others on the windshield in order to

avoid paying for parking, *In re Harrington,* 877 A.2d 570, 575 (Pa.Ct.Jud.Disc.2005).

In this case, the CJD rendered a legal conclusion that appellee's conduct did not meet the "so extreme" standard because it found that: his possession of the gun was legal; he did not threaten the young men with the gun; he never pointed the gun at their vehicle; he took particular care not to point the gun; the incident had escalated to the point where it was reasonable for appellee to be concerned or afraid that it would continue to escalate; it was not unreasonable for appellee to believe that showing the gun would prevent further escalation; the display of the gun lasted only 2–3 seconds; and the participants proceeded peacefully to Erie after the incident ended.

The CJD's focus, in assessing the legal question of whether appellee's conduct was so extreme as to implicate disrepute, or whether the conduct was threatening or unreasonable, failed to accurately assess the relevant facts and did not sufficiently consider the likely public perception of the incident. For example, in assessing the severity of appellee's conduct, we cannot agree with the CJD's conclusion that appellee "did not threaten Baldelli and Tanner with the gun." By appellee's own account, he deliberately retrieved and brandished the gun, with the specific intention of making the young men "back off." Not surprisingly, they immediately did so. Furthermore, Baldelli was shaken enough that, as the CJD found, he called his parents, who called state police, who in turn interrupted appellee's "peaceful" return to Erie County, and ultimately filed criminal charges against him. Additionally, in reaching its legal conclusion, the CJD failed to account for the fact that it was appellee who initiated the entire incident by passing Baldelli's car while making an obscene gesture. The CJD also ignored the speed the vehicles were traveling, which was over the posted speed limit of 65 mph.[9] There is no

9. Baldelli testified that he was traveling at 75 mph when appellee came up behind him, N.T., 4/6/11, 31; appellee did not admit to traveling at a certain speed, but admitted that he kept his cruise control on 71 mph and that "I cheat and I go a little faster sometimes." He then stated

indication why appellee did not simply slow down and let the other car pass instead of choosing to retrieve and brandish a gun as a way to "de-escalate" the situation.

But for the gun, we take notice that the road rage incident here is familiar to motorists who frequently travel Pennsylvania highways. Some motorists may believe that the right of way on the road, and the pace of travel, is theirs to dictate. In this case, it appears that the college students were doing nothing wrong besides speeding; nor initially did appellee do anything wrong, beyond his own speeding, when he flashed his lights to convey a desire to pass Baldelli's car. Nor is there necessarily anything wrong in appellee moving to the right hand lane and then accelerating to pass when Baldelli's response was not timely enough for his liking. Appellee then escalated the interaction, however, with the obscene gesture, and the ensuing back-and-forth between the two drivers—as common and dangerous as it is childish—played out predictably enough—until appellee introduced the gun. Viewed in terms of "escalations," "ending the episode," and reasonableness, it is notable that appellee chose not to "back off" himself. Instead, he brandished a firearm. The display of the handgun by appellee, during what was already a dangerous high-speed, mutual dispute, was obviously intended to intimidate the other driver. And, here, the tactic worked. Appellee's conduct was far more extreme, for purposes of assessing "extreme conduct" in the context of bringing the judicial office into disrepute, than the CJD appreciated.

The CJD's conclusion that appellee's conduct in displaying his handgun to cause Baldelli to "back off" was objectively reasonable, and thus not extreme, is similarly problematic. In this dispute between motorists, appellee was the initial aggressor; he continued the difficulty with his obscene gesture; and he escalated the encounter to a more dangerous level, after Baldelli initially responded to his provocation by returning the very same digital insult, by displaying his gun out the window.

that he was anxious to get home on the night of the incident. *Id.* at 78. Presumably, both cars were traveling at least 5–10 mph over the posted speed limit.

(For all appellee knew, Baldelli could have been armed, too, and matters could have "escalated" more.) Whatever "de-escalation" appellee achieved was not by virtue of his own conduct, reasonable or not, but by Baldelli's fortunately reasonable response. Baldelli "backed-down," just as appellee intended; but, appellee never backed down. To the contrary, he proceeded toward home, ahead of Baldelli, at the pace of travel he preferred. Accepting the CJD's factual finding that appellee himself subjectively believed that his conduct in speeding up and displaying the gun to force Baldelli to back down was reasonable, objectively viewed, and in light of appellee's overall role in this encounter, it was unreasonable and extreme.

In our view, the CJD's conclusion that appellee's conduct was neither threatening nor unreasonable was erroneous. Appellee's subjective assessment of the incident has little weight when considering the ultimate question of whether the public's perception of the judiciary as a whole is affected by appellee's initiation, continued participation in, and escalation of this incident involving the brandishing of a gun during a high speed dispute on the highway. Indeed, the Board's observation that this sort of incident invites the view that judges appear to believe that they are above the law is especially apt here. People who brandish guns during road rage incidents should properly expect themselves to be viewed as exhibiting disreputable conduct. This incident involves facts more damning than the MDJ's discourteous and undignified treatment of the traffic court defendants in *Marraccini* and is similar to the instigation of the altercation at a public golf course in *Hamilton*. Both cases resulted in a finding of disrepute under Section 18(d)(1). Accordingly, we conclude that the CJD erred in determining that the Board did not establish by clear and convincing evidence that appellee's conduct was "so extreme as to have brought the judicial office itself into disrepute" pursuant to Article V, Section 18(d)(1). We reverse that portion of the CJD's order and remand this case to the CJD for the imposition of a sanction consistent with the misconduct.

## B

The next question presented is whether this same conduct violated Rule 2A of the MDJ Rules. Rule 2A of the MDJ Rules requires an MDJ to "respect and comply with the law and ... conduct [himself] at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." As noted previously, this Rule is nearly identical to Canon 2 of the Code of Judicial Conduct.

The Board's argument is straightforward: the plain language of Rule 2A makes any type of criminal conduct subject to disciplinary action, appellee's conduct was criminal, and thus, Rule 2A makes appellee's conduct subject to disciplinary action. The Board argues that the decisional law from this Court suggesting a contrary result is mistaken and should be reconsidered. In response, appellee asks this Court to uphold those cases interpreting Rule 2A to require some connection between the criminal conduct and the judicial decision-making process. Appellee believes that the purpose of Rule 2A is only to make clear that MDJs will be held to a high standard for any conduct that affects their ability to dispense justice, and he argues that any interpretation should be consistent with this purpose.

This Court's *Cicchetti* decision forms the starting point for both parties' arguments. Richard D. Cicchetti served as a judge of the Court of Common Pleas of Fayette County. The complaint filed against him alleged, *inter alia,* sexual misconduct. The most significant of the complaints came from a female probation officer, who was assigned to Cicchetti's courtroom. The CJD found that Cicchetti repeatedly called her into his robing room where he discussed personal matters with her, including asking her to "get together" with him. She repeatedly refused him and he responded by telling her he could help her get ahead and threatening her father's job (with PennDOT). *Cicchetti,* 743 A.2d at 435–37. The CJD concluded that Cicchetti's conduct did not violate Canons 1 or 2 of the Code of Judicial Conduct.

On the Board's appeal, the Supreme Court reviewed the CJD's determination of whether Cicchetti's conduct violated Canons 1 and 2. In ruling that it did not, the *Cicchetti* majority was persuaded that both Canons related to the judicial decision-making process. The Court first considered Canon 1, which requires a judge to uphold the integrity and independence of the judiciary by stating that a "judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved." Code Jud. Conduct, Canon 1. Furthermore, Canon 1 provides that the Canons should be "construed and applied to further that objective." *Id.* According to *Cicchetti,* "the phrase 'independence and integrity of the judiciary' as used in Canon 1 relates to the judicial officer's impartiality and independence in the judicial decision-making process." *Id.* at 441. The Court then looked at Canon 2, but did not undertake an independent examination of the Canon, simply declaring without further explanation that, "Canon 2 similarly addresses the judicial decision-making process and seeks to avoid the appearance of influence over judicial activities." *Id.*[10]

*Cicchetti* clearly limited the application of Canon 2 to conduct implicating the judicial decision-making process, but did not squarely address the question of whether criminal conduct could violate Canon 2's mandate that judges must "respect and comply with the law" regardless of whether their conduct implicated the judicial decision-making process. That question was addressed by the Court in a *per curiam* order in *Harrington.*

In *Harrington,* an MDJ repeatedly parked at expired meters and placed a parking ticket issued to another person at a

10. This author wrote a concurring and dissenting opinion, joined by Mr. Justice Nigro, noting that the majority had cited no authority in support of its conclusion that a violation of Canons 1 and 2 must implicate the judicial decision-making process. The responsive opinion further offered that the majority's interpretation of the Canons was too narrow, as the focus should simply be on whether the conduct affected the integrity of the office. 743 A.2d at 446–47 (Castille, J., concurring and dissenting, joined by Nigro, J.).

previous date and time on her windshield in an effort to avoid paying for parking. The CJD concluded that this uncharged criminal conduct violated MDJ Rule 2A, which required MDJs to "respect and comply with the law" and further found that the fact that the criminal conduct was uncharged did not alter the violation. *Harrington,* 877 A.2d at 575 ("So, in this case, since [Harrington] admittedly failed to comply with the law and since that is specifically prohibited by Rule 2A of the Rules Governing Standards of Conduct of District Justices, we find that [she] has violated that Rule.").

On appeal, this Court reversed the CJD's conclusion on MDJ Rule 2A in a brief *per curiam* order. The order simply stated that the determination below was improper because the conduct "did not implicate the judicial decision-making process" citing *Cicchetti* as support. *Harrington,* 899 A.2d at 1120. Based upon this Court's rulings in *Cicchetti* and *Harrington,* the CJD in this case declined to find a violation of Rule 2A because the gun display incident did not implicate judicial decision-making.

■ The Board has asked us to revisit the prior decisions in *Harrington* and *Cicchetti* and find that they were wrongly decided, given the plain language of the Canons and MDJ Rules. This Court is generally faithful to precedent, honoring the doctrine of *stare decisis* in order to promote fairness and stability in the law. At the same time, we have recognized that *stare decisis* cannot be used as an excuse to perpetuate erroneous rulings. *See Estate of Grossman,* 486 Pa. 460, 406 A.2d 726, 731 (1979); *Mayhugh v. Coon,* 460 Pa. 128, 331 A.2d 452, 456 (1975).[11]

11. In *Mayhugh,* the Court further addressed why the doctrine of *stare decisis* should not be employed to perpetuate erroneous principles of law:

The doctrine of *stare decisis* was never intended to be used as a principle to perpetuate erroneous principles of law. While we fully ascribe to Lord Coke's evaluation of the importance of certainty in the law, this end obviously cannot outweigh the necessity of maintaining the purity of the law. The court's function is to interpret legislative enactments and not to promulgate them. Where, as here, by our decisions ..., the Court distorted the clear intention of the legislative enactment and by that erroneous interpretation permitted

The Board's request to reconsider *Cicchetti* and *Harrington* is a reasonable one, irrespective of the ultimate correctness of the holdings in those cases because, correct or not, neither the opinion in *Cicchetti* nor the *per curiam* order in *Harrington* offered developed reasoning in support of its construction of the conduct rules at issue. As explained below, we believe that the conclusion in *Cicchetti* is in tension with the plain language of the conduct rule. Moreover, the construction is problematic in that it did not promote the objective of the Canons, as required by Canon 1.

■■■ Generally, the interpretation of this Court's rules are considered through the lens of the Statutory Construction Act ("Act"), 1 Pa.C.S. §§ 1501–1991. *See, e.g., Commonwealth v. Far,* 616 Pa. 149, 46 A.3d 709, 712 (2012) (Pennsylvania Rules of Criminal Procedure are interpreted in consonance with Act); *Commonwealth v. Cooper,* 611 Pa. 437, 27 A.3d 994, 1003 (2011) (Pennsylvania Rules of Appellate Procedure and Criminal Procedure provide that they shall be construed according to Act); *see also In the Matter of Chiovero,* 524 Pa. 181, 570 A.2d 57, 60 (1990) ("The interpretation of [the judicial] canons is within [this Court's] sole jurisdiction and the application and enforcement of those canons is a part of our exclusive role as administrative and supervisory head of the unified judicial system in our Commonwealth."). The Code of Judicial Conduct and the MDJ Rules do not expressly provide that the Canons and Rules must be read in consonance with the Act, but because the Act collects fundamental precepts of construction, it provides the logical starting point for our analysis. Most importantly, Section 1921 of the Act states that a Court's role in all statutory interpretation is to ascertain the drafter's intent. 1 Pa.C.S. § 1921(a). Generally, the intent is found by looking at the plain meaning of the words of the statute. *Commonwealth v. McCoy,* 599 Pa. 599, 962 A.2d 1160, 1166 (2009). In looking at that language, we keep in mind that any

the policy of that legislation to be effectively frustrated, we now have no alternative but to rectify our earlier pronouncements and may not blindly adhere to the past rulings out of a deference to antiquity. *Mayhugh,* 331 A.2d at 456.

interpretation must be consonant with the overarching purpose of the Code of Judicial Conduct expressed in Canon 1 (and MDJ Rule 1), which is to preserve the integrity and independence of the judiciary. *See, e.g., Chiovero, supra.*

■ Canon 2 is introduced by the phrase, "A JUDGE SHOULD AVOID IMPROPRIETY AND THE APPEARANCE OF IMPROPRIETY IN ALL HIS ACTIVITIES." Section A requires a judge to "respect and comply with the law" and further states that the judge must "conduct himself **at all times** in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Code Jud. Con. Canon 2.A. (emphasis added). There is nothing in the plain and unambiguous language of Canon 2 suggesting that its application is limited to judicial decision-making activities.

The *Cicchetti* majority opinion did not address Canon 2's plain language, but instead based its conclusion on a preceding interpretation of Canon 1. The Court's entire analysis of Canon 2 consisted of the following two sentences:

> Canon 2 similarly addresses the judicial decision-making process and seeks to avoid the appearance of influence over judicial activities. Appellee is not subject to censure for a violation of Canon 2 based on his conduct toward [the victim] because it was independent of his decisionmaking duties.

*Cicchetti*, 743 A.2d at 441. The analysis did not address the plain language of Canon 2, which states that a judge must act in a certain way "in all his activities" or "at all times," without mentioning the decision-making process.

The *Cicchetti* majority's referral back to its construction of Canon 1 is no more enlightening, since Canon 1, by its plain terms, likewise never mentions the judicial decision-making process. Instead, the Canon requires a judge to observe "high standards of conduct so that the integrity and independence of the judiciary may be preserved." Canon 1 also provides that the Canons as a whole should be "construed and applied to further that objective."

The *Cicchetti* majority viewed Canon 1 as primarily a statement of purpose and construction, requiring that the Canons be construed in accordance with the Code's fundamental purpose of ensuring the integrity and independence of the judiciary. The Court then simply declared that "the phrase 'independence and integrity of the judiciary' . . . relates to the judicial officer's impartiality and independence in the judicial decisionmaking process." *Id.* at 441.

▮ The Court never attempted to explain why the requirement that judicial officers conduct themselves in a manner that preserves judicial integrity and independence was so limited; and we believe there is merit in the Board's position that the plain language of the provision is not so limiting. Canon 1 simply states that judicial officers must observe "high standards of conduct" in order to preserve judicial integrity and independence. It does not limit the phrase by requiring the conduct to occur within the judicial decision-making sphere; and such a limitation would have been easy to express affirmatively. A judicial office represents a public trust, and the conduct of a judicial officer may bear upon the independence and integrity of the judiciary regardless of whether the conduct implicates the decision-making process. One aspiring to, or holding, the office cannot reasonably expect to be a rogue in his or her private life without thereby staining the integrity of the position. Thus, we hold that *Cicchetti's* conclusion that Canon 2 applies only to conduct occurring within the judicial decisionmaking sphere was in error.

▮ The *per curiam* order in *Harrington*, which involved the interpretation of MDJ Rule 2A, simply applied the *Cicchetti* Court's conclusion without any further explanation or independent examination.[12] Like its counterpart, MDJ Rule 2A requires an MDJ to "respect and comply with the law and . . . conduct [himself] at all times in a manner that promotes

12. As discussed below, there was a colorable argument, apparently not made in *Harrington*, that the interpretation of Rule 2A should not have simply followed the interpretation of Canon 2 because of a distinction made between justices and judges versus justices of the peace in Article V, Section 17(b) of the Pennsylvania Constitution.

public confidence in the integrity and impartiality of the judiciary." Thus, by its plain terms, Rule 2A requires an MDJ to "comply with the law" and does not limit such compliance to conduct involving the judicial decision-making process. Such a plain meaning construction of Rule 2A is not only consonant with the rules of statutory construction and common sense, but to read it differently would also be contrary to MDJ Rule 1's stated purpose of upholding the integrity of the judiciary.

Further support for this reading may be found in the overall construct governing judicial conduct. The Pennsylvania Constitution commands, without qualification, that "justices and judges shall not engage in any activity prohibited by law." PA. CONST. art. V, § 17(b). However, that command does not apply to justices of the peace, *i.e.*, MDJs; instead, Section 17(b) states that justices of the peace shall be governed by canons or rules as prescribed by this Court. Reading MDJ Rule 2A in a manner that insulates conduct that violates the law, on grounds that the conduct does not involve the judicial decision-making process, would make MDJs immune from separate discipline for illegal conduct, where justices and judges are not. The fact that criminal conduct unrelated to the decisional process may violate Section 18(d)(1) by bringing the judicial office into disrepute does not make it any less unreasonable to indulge a non-textual, limiting construction of Rule 2A that would place such criminal conduct beyond its reach.

For these reasons, we conclude that the constructions of the conduct rules in *Harrington* and *Cicchetti* are unsustainable, and we accordingly overrule those decisions. We hold that MDJs may be subject to discipline for illegal conduct which affects the integrity of the office, within the discretion of the CJD, and subject to this Court's review, whether or not the conduct occurred within the judicial decision-making process.[13]

13. Of course, there may be instances where the criminal conduct is minor, *i.e.*, certain summary or misdemeanor offenses, that invocation

■ Having concluded that illegal conduct unrelated to the decisional process is subject to disciplinary action under Rule 2A, the question remains whether appellee's guilty plea to two summary offenses of disorderly conduct affected the integrity of the office and should be subject to disciplinary action; and, if so, what sanction is warranted. We would normally remand the question to the CJD for that determination in the first instance; the CJD did not address the question since it was bound to find that appellee's conduct did not violate Rule 2A based upon *Cicchetti* and *Harrington*. Nevertheless, we conclude that a remand is unnecessary on this issue because appellee's unlawful conduct was not a violation of Rule 2A as interpreted at the time of the incident.

■ Judicial disciplinary proceedings are quasi-criminal in nature; and judges must be afforded the same constitutional rights as criminal defendants, which would necessarily include notice as to what type of conduct is prohibited, consistent with due process. *See In re Merlo*, 58 A.3d at 8; *Chiovero*, 570 A.2d at 60 (judicial canons give little notice to those affected as to kinds of prohibited activity; breadth of canons must be considered in determining degree of notice afforded judge consistent with due process). Under *Cicchetti* and *Harrington*, appellee's conduct was not violative of Rule 2A at the time it was committed because it did not involve the judicial decision-making process. Thus, appellee was not on notice that such conduct violated Rule 2A. Nor was he on notice that he could be sanctioned for such conduct. *See Collins v. Youngblood*, 497 U.S. 37, 43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (original understanding of U.S. Constitution, prohibiting passage of *ex post facto* laws, provided that Legislatures could not retroactively alter definition of crimes or increase punishment for criminal acts). The circumstance is particularly important here because the existing precedent may well have influenced appellee's determination to plead guilty to reduced charges. Accordingly, there is no need to remand this case

of the disciplinary process and the imposition of sanctions is unwarranted. But, such instances are best evaluated on a case-by-case basis.

for further proceedings and our corrective holding respecting *Cicchetti* and *Harrington* will have prospective effect.

## II

### A

The next issue is whether appellee solicited funds on behalf of the task force or used the prestige of his office for the solicitation of funds in violation of Rule 11. The CJD made two important factual determinations with regard to this question. First, it determined that the Board's entire case for a violation of Rule 11 was premised on an editorial in a local newspaper. Second, it found that the editorial did not establish that appellee in fact had requested citizens to contact his office, since the editorial did not purport to quote appellee. Instead, the CJD determined that the statement was made by the editorial writer,[14] noting in the process that appellee had denied asking for donations and the CJD credited that testimony. Based on these factual determinations, the CJD concluded that the Board did not establish a violation of Rule 11 by clear and convincing evidence. We agree.

The question before this Court is whether the fact that an editorial, which identified appellee as an MDJ and the leader of the task force and directed interested readers to appellee's office if they wanted to contribute funds or services to the task force, amounted to the solicitation of funds by appellee on behalf of the task force. Merely because a newspaper represented that appellee was the contact person for contributions to the task force does not prove that appellee actually solicited funds. It does not prove that appellee asked the newspaper to list him as the contact person. The editorial proves only that the writer knew that appellee was an MDJ, who was also leading the task force, and then provided his easily accessible

14. The CJD reasoned that "[i]t is obvious from reading the editorial that the editorial writer and the editorial staff of the Erie Times–News knew how and when to designate a quotation" by using quotation marks. The editorial language attributed to appellee was not set off by quotation marks and thus was evidence that appellee did not make the statements seeking the solicitation of funds. *See* CJD Opinion, at 15–16.

public office information as contact information for citizens seeking to contribute time or money to the task force. Accordingly, given the factual findings made below, we find that the Board did not establish a violation of Rule 11 by clear and convincing evidence.

## B

The Board advances a similar argument regarding Rule 2A. Rule 2A prohibits an MDJ from lending the prestige of his office to advance the private interests of others. The CJD found that the eradication of graffiti was a public, and not a purely private, interest. The court noted that the task force was formed by the Mayor of Erie in an effort to combat the existence and proliferation of graffiti, which the court believed was a public issue. *Carney*, 28 A.3d at 270.

We see no error in this conclusion. Rule 2A is written to address those activities that "advance" private interests. By its plain language it does not apply to those activities which advance a public interest, but may incidentally benefit a private interest. Furthermore, the Board's argument that private interests were benefitted by the task force's work is tenuous at best. The Board's argument is based on the fact that local business leaders and people from the private sector were involved in the task force and the task force cleaned up graffiti on a synagogue and other private businesses when eradicating graffiti in Erie. According to the Board, these facts show that private interests were advanced by the task force. However, merely because a public interest project also benefits a private citizen or entity does not necessarily prove "advancing" a private interest for purposes of the proscription in Rule 2A. Indeed, most public interest projects incidentally benefit private individuals or entities in some fashion; the "public" consists of private citizens. It would defy common sense to discourage members of the judiciary from participating in public interest groups merely because the work of the group also incidentally benefits some private individual or entity. Accordingly, we conclude that the CJD did not err in determining that the Board did not

508

establish a violation of Rule 2A by clear and convincing evidence.

## C

Finally, the Board contends that appellee's involvement in the task force and his related violation of Rule 11 and Rule 2A brought the judicial office into disrepute in violation of Article V, Section 18(d)(1) of the Pennsylvania Constitution. In our view, appellee's involvement as head of the task force is not the type of "conduct [that] is so extreme as to have brought the judicial office itself into disrepute." *Berkhimer, supra.* Obviously, judges should be circumspect in their public associations, mindful of the effects on public perception. But, we do not read the disrepute provision in such a broad way as to exclude involvement in a public interest group, especially when the particulars of the association derive from information appearing in a newspaper editorial. Thus, we dismiss this challenge as meritless.

## III

For the reasons stated above, we reverse the portion of the CJD's order which found that the Board failed to establish that appellee's conduct in the road rage incident did not constitute "disrepute" in violation of Article V, Section 18(d)(1) of the Pennsylvania Constitution; and, we remand for further proceedings to determine the appropriate sanction for that conduct. We affirm the remaining determinations of the CJD.

Former Justice ORIE MELVIN did not participate in the consideration or decision of this matter.

Justices SAYLOR, EAKIN, BAER, TODD and McCAFFERY join the opinion.